UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAURIE A. DROGOWSKI

    Plaintiff,       Case No. 06-10865

vs.            DISTRICT JUDGE JOHN CORBETT O'MEARA
              MAGISTRATE JUDGE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I. BACKGROUND**

  Laurie Drogowski brought this action under 42 U.S.C. §405(g) to challenge a final

decision of the Commissioner denying her application for Disability Insurance Benefits (DIB)

under Title II of the Social Security Act.  Both parties have filed motions for summary judgment,

which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following

reasons, **IT IS RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** and the

Commissioner's motion for summary judgement **GRANTED**.

  **A. Procedural History**

  Plaintiff applied for DIB in June 2001 (R. 41-43), alleging that she became disabled April

4, 2000, due to fibromyalgia and neck pain (R. 53).  After Plaintiff's claim was initially denied

(R. 28-32), a hearing was held on September 21, 2004, before Administrative Law Judge B.

Lloyd Blair (ALJ) (R. 313-335).  A non-attorney, Terrasita Cuffie, represented Plaintiff and

Vocational Expert Heather Benton (VE) also testified (R. 331-335).

In a December 22, 2004, decision ALJ Blair concluded that Plaintiff was not under a disability as defined by the Act because Plaintiff could perform her past relevant work as a bookkeeper, clerk, and office manager, as typically performed in the economy at the sedentary level of exertion (R. 14-20).  On February 9, 2006, the Appeals Council denied Plaintiff's request for review (R. 6-8).

**B.**     **Background Facts**

        **1.**     ***Plaintiff's Hearing Testimony***

Plaintiff was 42 years old, 5'2" tall and weighed 145 pounds at the time of the hearing (R. 317).  She finished the twelfth grade and had no other schooling or vocational training.  Plaintiff was married and has five children – three adult and two who were 11 (R. 322)

Her last full time employment was with Spectrum Printers as a bookkeeper, a position she held from August 1990 until April 2000 (R. 318, 66).  Plaintiff testified that she was on her feet 25 percent of her shift and lifted 30 pounds maximum.  Due to pain Plaintiff reported that she was unable to move up and down to access the files, take phones messages or use a computer because of pain associated with typing (R. 327).  From October 1989 until January 1990, Plaintiff worked as an inventory clerk for Buckeye Products.  Plaintiff was on her feet 50 percent of her shift and lifted 40 pounds maximum.  From February 1989 until October 1989, Plaintiff worked as an office manager for an insurance company (R. 319, 66).  Plaintiff was on her feet 50 percent of her shift and lifted 20 pounds maximum.  From August 1986 until October 1988, Plaintiff worked as a receptionist/office manager for WLEN, a radio station.  Plaintiff was on her feet 40 percent of her shift and lifted 40 pounds maximum.  Plaintiff had not worked since her

alleged onset of disability date of April 4, 2000.[1]

Plaintiff testified that she was unable to work full time due to fibromyalgia diagnosed in April 2000, neck pain, back pain, and pain associated with walking, sitting, bending, lifting or carrying items (R. 320). Plaintiff indicated that her pain is mostly constant and Darvocet dulls it allowing her to rest (R. 327). Dr. Michael Dawson treated Plaintiff for fibromyalgia and prescribed a cane, which Plaintiff used for two months prior to the hearing (R. 320). Plaintiff reported taking Celebrex, Effexor XR and Darvocet for approximately the last four years to treat her fibromyalgia. Plaintiff had no medication side effects, unless she took Darvocet on an empty stomach in which case she became "dizzy or woozy" (R. 321). Plaintiff had migraine headaches "about once every three months – two months" (R. 328). She described them as bad or very severe, but indicated she was able to function and that Imitrex and Migranol help to alleviate the pain in about an hour (R. 329).

Plaintiff could lift five pounds maximum, stand for approximately 10 minutes, sit for an hour and could walk about one city block in 10 to 15 minutes with one to two minute breaks (R. 322). In addition, Plaintiff could occasionally bend over and climb stairs "very, very slowly, " but not squat (R. 324). She had not been hospitalized or visited an emergency room for 12 month prior to the hearing.

Plaintiff reported suffering from depression, crying spells and memory loss (R. 329). Medication reduced her crying spells to "about once a month." Plaintiff was treated by a psychologist two to three years prior to the date of the hearing (R. 331).

---

[1] Plaintiff stated that she believed a motor vehicle accident in 1993 is the source of her problems, but indicated she worked from 1993 to 2000 without experiencing any discomfort (R. 327).

Plaintiff attended church approximately every two months (R. 323, 325). She cooked with the assistance of a stool, used a vacuum cleaner, did laundry and went grocery shopping with assistance, but did not do yard work (R. 322, 326). Approximately three weeks prior to her hearing, Plaintiff went to Frankenmuth for a two day vacation. She did not have any hobbies, but enjoyed reading mysteries and news magazines (R. 323). Plaintiff did not drive because her neck pain frustrates her ability to turn her head from side to side (R. 329).

On a typical day, Plaintiff rose at 6 am and went to bed "anywhere from midnight to 4:00" (R. 324). She got her children ready for school and then walked on her treadmill before taking a shower or bath. Plaintiff did housecleaning, but took breaks throughout the day (R. 325). At night, she made dinner and helped her children with their homework. Plaintiff's husband and children cleared the table, and she loaded the dishwasher. In response to questions from her representative, Plaintiff stated that there are about 20 days out of 30, however, where she could not do any of those activities and was unable to get out of bed due to pain.

## 2.  *Medical Evidence*

In April 2000, rheumatologist, Timothy Lang, M.D., examined Plaintiff, and wrote to Laurie Barkway, D.O, that Plaintiff's magnetic resonance images (MRI) did not suggest any serious structural defect even though Plaintiff had been on a "deteriorating course" (R. 148-149). Her neurological evaluations did not disclose any surgically treatable lesions, but Plaintiff appeared to develop more pain, tremors, depression, and failed multiple medications. Plaintiff had persistent tilt of the head to 15 degrees and tremendous muscle tenderness and spasm throughout the paracervical region. Plaintiff had mild tenderness in her upper extremities, particularly around her shoulders, but she had a reasonable range of shoulder motion. While her

4

lower extremities were unaffected, her reflexes were hyperreflexic globally.  She did not have any adenopathy.  Dr. Laing concluded Plaintiff had fibromyalgia, depression and incipient torticollis, but was not in distress.

In April 2000, Rebecca Poetschke, D.O., saw Plaintiff and reviewed her MRIs of the brain and cervical spine (R. 125).  Dr. Poetschke determined that there were mild degenerative changes in the cervical spine with some bulging of the third, fourth, and sixth discs with basically no encroachment on the existing nerve roots (R. 126).  She diagnosed migraine headaches and fibromyalgia (R. 127).

On May 3, 2005, Plaintiff was seen at the emergency room complaining of shaking and jerking spells (R. 107-108, 110).  Her history noted fibromyalgia, a hard time walking, and use of a neck brace, and back pain muscle simulator.

In May 2000, Plaintiff was examined by pain specialist Richard Bundschu, M.D.  In a letter to Dr. Laing, he stated Plaintiff had non-specific tremor in all four extremities.  She was able to stand on her toes and her heels without any major difficulty.  Motor examination of her upper and lower extremities was overall intact and bilaterally symmetrical.  There were no signs of atrophy, edema or temperature changes.  Her sensory examination in the upper and lower extremities was non-focal and her reflexes were two to three throughout and were bilaterally symmetrical in nature.  Plaintiff's peripheral pulses were easily palpated.  There were no signs of regional lymphadenopathy or spinal instability.

On June 13, 2000, Plaintiff was evaluated by neurologist, Steve Swanson, M.D.  Plaintiff had multiple symptoms associated with neck, arm, low back and lower extremity pain.  Most of her symptoms were worse on the right side.  She was observed to be in moderate distress.

5

Plaintiff held her head tilted slightly downward and to the right and had limitation of motion in all spheres.  She had exquisite tenderness even to light palpation in the cervical region and gave way weakness in both upper and lower extremities.  Sensation was diffusely diminished over the right upper and lower extremities.  She had a markedly antalgic gait favoring her right leg (R. 115).  She had diffuse low back tenderness and bilateral straight leg raising.  Dr. Swanson recommended continued pain management and treatment for possible fibromyalgia (R. 116)

In August 2000, Dr. Bundschu began administering cervical epidural steroid injections, which are reported through March 2001 (R. 169, 166, 163, 151, 274).  In October 2000, Dr. Bundschu began administering bilateral sacroiliac joint injections, which are reported through September 2002 (R. 275-277, 282-283).  Plaintiff received greater trochanteric bursa injections on September 4, 2002, and September 11, 2002 (R. 282-283).  Plaintiff received lumbar epidural steroid injections on December 29, 2000, January 10, 2001, and January 24, 2001 (R. 160, 157, 154).

On August 30, 2000, Timothy Laing, M.D., reported that although Plaintiff did not have structural abnormality on any of her studies to support physical injury to her bony structure, she had a severe pain syndrome and muscle dysfunction.  He opined that Plaintiff was disabled, particularly with respect to her previous job which required her to look at a computer terminal for up to 8 hours per day (R. 281).

In January 2001, a rehabilitation specialist, Saad M. Al-Shathir, M.D., reviewed Plaintiff's medical records for what appears to be an insurance claim (R. 135-40).  He determined that her impairments would not prevent her from performing her past work as a bookkeeper, as she did not have any significant limitations on her abilities to stand, walk, sit, or

6

lift light amounts of weight.

On January 10, 2001, Plaintiff began treatment with Joanna Bielenin Ph.D., on a weekly basis for depression and anxiety (R. 141). Plaintiff complained that she had a pain level that interfered with her ability to perform activities of daily living and playing with her children. Dr. Bielenin indicated that treatment was strategically focused on the modification of eating disorders. In addition, she was exploring the dynamics, which were underlying Plaintiff's anxiety and depression.

On March 12, 2001, Plaintiff was seen by rheumatologist, James E. Dowd, M.D., FACR, who performed an independent medical evaluation (R. 227). Plaintiff reported pain in her neck, lower back, shoulders and hips. She had nonrestorative sleep and fatigue, and recently had been experiencing open sores. Plaintiff had torticollis to the right with limitation of rotation. Flexion and extension was limited by pain. She had more than 11/18 tender points as defined by 1990 ACR criteria for fibromyalgia (R. 228). She had a theatrical pain reaction with shaking all over and writhing motion. Dr. Dowd noted that this reaction was not characteristic of fibromyalgia and that his findings suggested somatization. His prognosis for Plaintiff was poor, primarily due to her lack of insight into her problem. Physically, Dr. Dowd opined that Drogowski should be able to perform a variety of work conditions including her sedentary job of bookkeeping. Psychologically, Dr. Dowd recommended that Plaintiff be evaluated by a psychiatrist and receive treatement.

On May 29, 2001, Plaintiff saw neurologist, Allan Clague, M.D., complaining that her entire body hurt. She had a numbing type pain in her neck and any type of movement aggravated her pain (R. 223). Plaintiff was observed to be quite uncomfortable throughout the

interview and examination.  She had great difficulty when attempting to shrug her shoulders.

There was marked tightness of the steroncleidomastoid muscles of the neck.  Plaintiff had mild

to moderate weakness in both arms and legs and had decreased grip strength. There was

weakness of the hamstrings and Plaintiff had partial foot drop (R. 224).  Plaintiff's gait was slow

and antalgic. There was limited range of motion of the cervical spine.

Dr. Clague's assessment was chronic pain syndrome, but he indicated he "could not make

any definitive diagnosis at this time" on the basis of the clinical history and the neurological

examination "inasmuch as there was a most important extensive differential diagnosis" in her

particular situation (R. 225).  He did not feel the need for further examination and did not plan

any revisits.  Dr. Clague opined that Plaintiff was totally disabled medically form carrying out

any form of gainful employment and recommended that the patient apply for Social Security

Disability.

On October 22, 2001, Dinesh D. Tanna, M.D., completed a Physical Residual Functional

Capacity Assessment (R 244-251).  He found that Plaintiff could lift 20 pounds frequently and

lift 10 pounds occasionally and stand and/or sit six hours in an eight hour workday (R. 245).

Plaintiff had no postural limitations and was unlimited in her ability to push and/or pull.  Dr.

Tanna opined that the severity of or duration of Plaintiff's symptoms were disproportionate to

the expected severity or duration of the impairment (R. 249).

On October 25, 2001, Elizabeth Bishop, Ph.D., conducted a psychological consultative

evaluation for the Michigan Disability Determination Service.  Plaintiff complained of chronic

pain, sleeplessness, depression and mood swings (R. 252).  Plaintiff did not drive due to pain and

anxiety.  Her hygiene was fair.  Her gait was slow and painful.  She had trouble staying seated

due to pain. Plaintiff had good reality contact with low self-esteem. She was moderately depressed with fair eye contact (R. 253). Dr. Bishop diagnosed depressive disorder and gave a GAF score of 56 (R. 254).[2] Her prognosis was guarded and she noted that Plaintiff would benefit from mental health treatment as well as involvement with a support group for individuals with fibromyalgia (R. 255).

On January 15, 2002, Charles Overbey, M.D., completed a Mental Residual Functional Capacity Assessment (R. 270-274). He noted that in addition to doing household tasks, attending school activities of her children, going out to eat, "She can go camping 3-4 days at a time w. family." (R. 272). He found that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures or in her ability to understand and remember either simple or detailed instructions. Dr. Overbey opined that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, and perform activities within a schedule, or maintain regular attendance within customary tolerances.

In April 2002, Plaintiff was evaluated by Michael H. Dawson, M.D. (R. 290). His

_____

[2] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

impression was that Plaintiff had chronic myofascial syndrome involving the low back and lower extremities.  He did not feel that there was medical treatment for her condition, but recommended that she continue heat and massage home programs and the use of pain medication on an as needed basis.  Dr. Dawson recommended further that Plaintiff enter formal physical therapy if the home modalities and treatments failed to adequately control her discomfort.  On November 26, 2002, Plaintiff was re-evaluated by Dr. Dawson (R. 286).  He did not feel that Plaintiff was capable of resuming work activities.  Due to her fibromyalgia and possibility of underlying neurologic disease, Dr. Dawson felt Plaintiff was permanently disabled and required the use of pain medications on a regular basis and significant restrictions in her activities (R. 286).

On January 31, 2003, Dr. Clague reported that Plaintiff had made definite improvement and that he was very pleased with her progress (R. 294). Yet, based upon Plaintiff's clinical symptomatology and neurological examination, Dr. Clague concluded Plaintiff remained totally disabled from carrying out any form of gainful employment.

On September 16, 2004, Dr. Dawson indicated that Plaintiff constantly had fatigue, weakness and pain that interfered with her ability to concentrate and pay attention and continued to be unable to work (R. 299).  Plaintiff reported that she was able to stand for 10 minutes before needing to sit and rest.  She did household chores for short time periods and did not drive.  Plaintiff estimated that she could lift 4 pounds.  She had a significant antalgic gait.  Dr. Dawson recommended a multidisciplinary Pain Clinic. (R. 297).  He noted that despite a recommendation sent to the Pain Clinic at the University of Michigan, in August 2003, Plaintiff stated she was denied assessment because she was told her pain was "not disabling enough" (R. 296).

Medical Evidence Submitted After the December 22, 2004 decision to the Appeals Council[3]

On June 21, 2005, Dr. Dawson completed a "medical source statement concerning the nature and severity of an individual's physical impairment" (R. 304). He reported that Plaintiff was unable to sit or stand for any length of time before requiring a rest or an alternative position and could walk for one hour in a 8 hour day. Dr. Dawson opined that Plaintiff could lift 5-8 pounds maximum for approximately 2-3 hours in a work shift (R. 306). He again concluded that Plaintiff was not employable (R. 311).

### 3. *Vocational Evidence*

VE Benton described Plaintiff's past relevant full time positions (R. 333). Her bookkeeper job is classified as sedentary and skilled, but because Plaintiff lifted a significant amount of weight at Spectrum Printers she performed the position at a medium exertional level. Similarly, her position as inventory clerk for Buckeye Products is classified as sedentary and skilled, but because Plaintiff lifted more weight than is expected for that position she performed at a medium exertional level. Her job as office manager at the insurance company and radio station is listed as sedentary and skilled. Yet, as actually performed, her job at the insurance

---

[3] Because this evidence was not before the ALJ when he rendered the final decision of the Commissioner, it cannot be considered for substantial evidence review. *See Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 685 (6th Cir. 1992). The only purpose for which this Court can consider this additional evidence is to determine whether this case should be remanded to the agency pursuant to the sixth sentence of 42 U.S.C. § 405(g). *Cotton v. Secretary of Health and Human Services*, 2 F.3d 692, 695-96 (6th Cir. 1993). This court may remand the case if the additional evidence is new and material, and if there was good cause for failure to incorporate the additional evidence into the record at a prior hearing. 42 U.S.C. § 405(g) (sentence six); *See Wyatt*, 974 F.2d at 685; *Casey v Secretary of Health and Human Services*, 987 F.2d 1130, 1233 (6th Cir. 1993).

company was light and her job at the radio station was medium.

ALJ Blair asked VE Benton to consider an individual who can meet the demands of light work, should never use ladders, scaffolds, or rope, and only occasionally use ramps or stairs, and who should avoid exposure to extreme cold (R. 334). VE Benton testified that this hypothetical person could perform Plaintiff's past relevant work as office manager as typically and actually performed, as well as all of her other past work as typically performed. ALJ Blair then asked the VE to assume he found Plaintiff's testimony to be credible in all respects regarding pain limitations. VE Benton stated that assuming Plaintiff's testimony was credible would preclude all competitive employment.

In response to questions from Plaintiff's representative, VE Benton testified that Plaintiff's difficulty with head rotation would not effect her response to the original hypothetical. While some of the positions may involve phone operation, a number of the jobs would allow for headsets, which would eliminate Plaintiff's need to use her hand or shoulder to hold the phone.

### 4.   *The ALJ's Decision*

ALJ Blair found that Plaintiff met the nondisability insured requirements of the Act through the date of the decision (R. 19). Plaintiff's fibromyalgia qualified as a severe impairment. The severity of Plaintiff's conditions did not meet or equal the requirements of any impairment listed in Appendix 1, Subpart P, of Regulations No. 4 (20 C.F.R. § 404.1520(d)) (the "Listing"). Moreover, ALJ Blair found that Plaintiff's medically determinable fibromyalgia did not preclude her from performing her past relevant work (R. 20).

ALJ Blair found that Plaintiff's allegations regarding her limitations were not fully credible because the degree of pain and limitation alleged was not consistent with the objective

12

medical evidence, including the testimony at the hearing (R. 18). He noted that Plaintiff had not required long-term hospitalization for any physical or mental difficulties and treatment did not appear to be regular since 2003. The physicians who have examined and diagnosed Plaintiff were divided in her ability to return to work. Dr. Dowd stated that Plaintiff is capable of performing in a variety of working conditions, including her sedentary job of bookkeeper. On the other hand, Dr. Claque "suspected" Plaintiff may have a lifelong disability and Dr. Dawson, Plaintiff's primary care physician, concluded Plaintiff was disabled due to her fibromyalgia and underlying neurologic disease. ALJ Blair noted that Dr. Claque's determination of disability was made in spite of his inability to diagnosis Plaintiff or recommend a course of treatment and Dr. Dawson's findings were made subsequent to Dr. Claque's examination.

In light of Plaintiff's depression, ALJ Blair evaluated Plaintiff's functioning on the "B" and "C" Criteria of the Psychiatric Review Technique Form ("PRTF"). He found that the evidence supported only mild restrictions of activities of daily living. ALJ Blair noted that Plaintiff did laundry, vacuumed, prepared meals for her family, swept either on a daily basis or every other day and shopped with assistance (R. 18). She was able to walk a block in ten to 15 minutes and could sit for one hour straight. Moreover, Plaintiff testified that she used a treadmill daily for exercise. While she had been prescribed a cane two months prior to the hearing, she had never fallen.

ALJ Blair found that Plaintiff had mild difficulties in maintaining social functioning. She visited with family approximately every two weeks and was visited by her mother, in-laws, sisters, best friend and children. Approximately once per month, Plaintiff's husband drove her to visit relatives and friends. In addition, Plaintiff testified that she was able to vacation for two

13

days.  Finally, ALJ Blair opined that Plaintiff had moderate limitations in maintaining

concentration, persistence or pace.  Plaintiff reported that she could read magazines, books and

newspapers for 30 minutes, and watched television and listened to the radio.  Further, there was

no evidence of decompensation and no evidence established the presence of  "C" criteria.

ALJ Blair found that Plaintiff had the following residual functional capacity (RFC): can

lift a maximum of 20 pounds, can lift ten pounds frequently and ten pounds occasionally, can

stand, walk, and sit for six hours, should never use ladders, scaffolds, or ropes, should only

occasionally use ramps or stairs, and should avoid concentrated exposure to extreme cold.  He

concluded that Plaintiff's past relevant work did not require the performance of work-related

activities precluded by her residual functional capacity (R. 20).  Therefore, ALJ Blair determined

that Plaintiff was not disabled.

## II.    ANALYSIS

### A.    Standard Of Review

In adopting federal court review of Social Security administrative decisions, Congress

limited the scope of review to a determination of whether the Commissioner's decision is

supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and

Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence has been defined as

"[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting

Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Commissioner's findings are

not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v.*

*Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[4]  A response to a flawed hypothetical question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.   Factual Analysis

In her motion for summary judgment Plaintiff argues that ALJ Blair erred as follows: (1.) discounting Plaintiff's credibility and (2.) by forming a deficient hypothetical question.

### 1.   *Medical Evidence and Plaintiff's Credibility*

Plaintiff claims that the ALJ improperly assessed her credibility and as a result failed to adequately assess Plaintiff's fibromyalgia.  Subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))" *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986).  While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of

---

[4] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

disability, (*Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981);

*Jones v. Commissioner of Social Sec.*,  336 F.3d 469, 476 (6th Cir. 2003), there are limits on the

extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's

testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also

objective medical evidence of an underlying medical condition in the record that would explain

such pain.  *See Young v. Secretary of Health & Human Servs.,* 925 F.2d 146, 150-51 (6th Cir.

1990); *Duncan,* 801 F.2d at 852.  While the underlying condition must have an objective basis,

neither the Social Security Act nor the regulations require a claimant to prove the degree of pain

and limitations by objective medical evidence.  Thus, an adjudicator may not reject a claimant's

subjective complaints based solely on a lack of objective medical evidence to fully corroborate

the alleged severity of pain.  Section 404.1529(c)(2),11  29 C.F.R. § 404.1529(c)(2) states:

> We will not reject your statements about the intensity and persistence of your pain
> or other symptoms or about the effect your symptoms have on your ability to
> work solely because the available objective medical evidence does not
> substantiate your statements.

 *See also Duncan,* 801 F.2d at 853; *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir. 1986);

*Bunnell v. Sullivan,* 947 F.2d 341, 345 (9th Cir. 1991) (*en banc*); *Benson v. Heckler,* 780 F.2d

16, 17 (8th Cir. 1985); *Halpin v. Shalala,* 999 F.2d 342, 346 (8th Cir. 1993).

Yet, in determining the existence of substantial evidence, it is not the function of the

federal court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of

credibility.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989);

*Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In *Jones* the Court noted that an ALJ can

reject a claimant's credibility on pain and other symptoms, and exclude these from the

16

hypothetical question to the VE, if the ALJ's reasons are adequately explained.  *Jones,* 336 F.3d at 476.

While fibromyalgia is difficult to determine and subjective evidence is used more extensively given the limited objective determinants, its diagnosis need not mandate a finding of disability where the evidence is equivocal and divided as in ths case.[5]  Because fibromyalgia eludes objective diagnostic techniques, courts have been hesitant to affirm an ALJ's denial of benefits to claimants who have been diagnosed with fibromyalgia by their treating physicians where the ALJ relies solely on the lack of objective medical evidence.  *See Green-Younger v. Barnhart,* 335 F.3d 99, 108-9 (2d Cir. 2003).  In the present case, ALJ Blair took Plaintiff's subjective complaints into account in finding that she had fibromyalgia and it was a severe impairment (R. 19).  Yet, he did not fully credit the extent of her statements as to symptoms and limitations.  It is true that ALJ Blair did justify his finding that Plaintiff's allegations regarding

---

[5] The Sixth Circuit has joined a growing number of courts in recognizing that a complete reliance on objective evidence in fibromyalgia cases amounts to a legal error because the disease defies diagnosis by traditional medical diagnostic techniques.  *Preston v. Sec'y of Health & Human Servs.,* 854 F.2d 815 (6th Cir. 1988).

> Fibrositis [now commonly referred to as fibromyalgia] causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances.  *In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results*—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions.  *There are no objective tests which can conclusively confirm the disease*; rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients.  *The medical literature also indicates that fibrositis patients may also have psychological disorders.*  The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

*Id.* at 817-18 (emphasis added).

her limitations were not fully credible because the degree of pain and limitation alleged was not consistent with the objective medical evidence.  Because fibromyalgia is not likely to have much objective medical support, had ALJ Blair done no more than this, his decision could not be upheld.  Yet, ALJ Blair's justification for discounting Plaintiff's credibility went beyond the lack of objective evidence.  ALJ Blair noted inconsistency of the claimed level of limitation with the testimony at the hearing and the information Plaintiff provided on her daily activity questionnaire.  Specifically, he noted that Plaintiff had not required long-term hospitalization for any physical or mental difficulties and treatment did not appear to be regular since 2003.  Again, were this all that was in the record supporting the credibility finding, such a thin justification would be problematic.

Yet, in this case other physicians who examined and diagnosed Plaintiff were divided in their assessment of her degree of limitation and her ability to return to work.  Dr. Dowd stated that Plaintiff is capable of performing in a variety of working conditions, including her job of bookkeeper, at least at the sedentary exertional level.  He noted that Plaintiff exhibited "very theatrical pain on examination with shaking and writhing movements upon light touch anywhere on her body" (R. 227).  This evidence reasonably cast doubt on the credibility of Plaintiff's subjective allegations.  In addition, Dr. Al-Shathir reviewed Plaintiff's medical records and determined that her impairments would not prevent her from performing her past work as a bookkeeper, as she did not have any significant limitations on her abilities to stand, walk, sit, or lift light amounts of weight (R. 135-40).  Also, Dr. Tanna found Plaintiff's symptoms disproportionate to the expected severity and that she had the physical capacity for light work (R. 249, 245).

18

On the other hand, Dr. Clague "suspected" Plaintiff may have a lifelong disability and Dr. Dawson, Plaintiff's primary care physician, concluded Plaintiff was disabled due to her fibromyalgia and underlying neurologic disease. While the opinions of Dr. Dowd and Dr. Al-Shathir might be subject to question as biased and based on a more limited non-treating basis of information, it cannot be said on this record that the ALJ is precluded as a matter of law from crediting these expert opinions. When there is a "battle of experts" with opinions in conflict, reviewing courts should generally defer to the factual determination of the administrative agency to which Congress had delegated such fact finding authority. ALJ Blair noted reasons for his discounting Dr. Clague's determination of disability. He indicated that Dr. Clague asserted his determination of disability in spite of his inability to diagnosis Plaintiff or recommend a course of treatment. ALJ Blair noted that Dr. Dawson's findings were made subsequent to Dr. Clague's examination, suggesting that they may have been affected by Dr. Blair's unsubstantiated opinion.

Under 42 U.S.C. 405(g), Congress has limited federal court's authority in disability reviews, and if substantial evidence supports the ALJ's decision, as it does in this case with two medical sources supporting the ALJ's finding, it must be affirmed – even if substantial evidence also supports the opposite conclusion, and even if this Court would have reached a different conclusion. *See Buxton v. Halter*, 246 F.3d 762, 772-773 (6th Cir.2001)(substantial evidence standard encompasses a "zone of choice" within which the Commissioner can act without court interference (internal citations omitted)).

Finally, with respect to activities of daily living, Plaintiff reported that she did laundry, vacuumed, prepared meals for her family, swept either on a daily basis or every other day and

19

shopped with assistance.  She could concentrate enough to read magazines, books and newspapers for 30 minutes, and watch television and listen to the radio.  Given the equivocal medical evidence and the evidence that Plaintiff could manage her personal care needs with limited assistance, was oriented to person, place, and time, and in all other respects is able to function on a daily basis, substantial evidence supports the ALJ's decision to discount Plaintiff's credibility.

### 2.    *Hypothetical Question*

Plaintiff asserts that in determining that she could perform her past work, the ALJ relied on a deficient hypothetical question to the VE because it did not adequately address her mental impairments.  It would have been preferable if ALJ Blair had incorporated into his hypothetical question moderate limitations on concentration, persistence or pace as he had found in his decision (R. 18).  If remand is warranted, it would be to correct this deficiency.  The ALJ asked the VE, and the corresponding answer the ALJ relied on included Plaintiff's substantiated impairments and resultant limitations.  The ALJ may pose hypothetical questions to the VE which include only those limitations which the ALJ finds credible. *Casey v. Sec'y of HHS*, 987 F.2d 1230, 1235 (6th Cir. 1993).  Yet, these were all physical limitations, no psychological limitations on concentration, persistence or pace or other such problems.  In this case, the medical record does not establish that Plaintiff had an impairment that more than minimally interfered with her ability to perform the mental demands of her past work.  As noted below, this case was presented by Plaintiff and her representative primarily based on physical limitations.

Moreover, in light of Plaintiff's depression, ALJ Blair evaluated Plaintiff's functioning on the "B" and "C" Criteria of the Psychiatric Review Technique Form ("PRTF"). There was no

evidence of decompensation and no evidence established the presence of "C" criteria. Under the "B" criteria he found that the evidence supported only mild restrictions of activities of daily living. ALJ Blair noted that Plaintiff did laundry, vacuumed, prepared meals for her family, swept either on a daily basis or every other day and shopped with assistance (R. 18). ALJ Blair found that Plaintiff had mild difficulties in maintaining social functioning. She visited with family approximately every two weeks and was visited by her mother, in-laws, sisters, best friend and children. Approximately once per month, Plaintiff's husband drove her to visit relatives and friends. In addition, Plaintiff testified that she was able to vacation for two days. Yet, ALJ Blair did find that Plaintiff had moderate limitations in maintaining concentration, persistence or pace. Although he noted that Plaintiff reported that she could read magazines, books and newspapers for 30 minutes, and watched television and listened to the radio.

The ALJ did not inquire about such concentration limitations nor did Plaintiff's representative. The VE testified that she sat through Plaintiff's testimony. Plaintiff noted that her depression caused crying spells but these were reduced to once a month with her medication (R 329). When asked if she had other symptoms of depression other than the crying, Plaintiff stated she had none other than memory loss (R. 330). Plaintiff's application and June 11, 2001, Disability Report make no claims for mental limitations and her doctors listed are solely for her physical problems (R. 55-56). At her hearing, only the once a month crying spells and memory loss are noted in the questions of the ALJ and Plaintiff's representative. Plaintiff's representative ask the VE no questions concerning any mental limitations (R 334-35). Nor does the record support a disabling mental disorder. Plaintiff saw psychologist Joanna Bielenin in 2001, but her report made no mention of crying spells or memory problems (R. 141). The

21

evaluation of consulting psychologist Elizabeth Bishop also makes no mention of crying spells or memory problems (R. 252-255). Dr. Bishop does note that Plaintiff saw a psychologist for depression for five months earlier that year, but "stopped since she felt better" (R. 252). She also noted Plaintiff had no psychiatric hospitalizations. Nor is there any evidence of long term psychiatric therapy. Dr. Charles Overbey, M.D., completed a Mental Residual Functional Capacity Assessment and noted that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures or in her ability to understand and remember either simple or detailed instructions.

This application was presented as a physical limitations claim with attendant depression related to the pain and physical limitations. While it would have been preferable for ALJ Blair to include a premise on moderate limitations of concentration, persistence or pace in his hypothetical, based on this record, there is insufficient reason to remand for mental limitations that have so little support in the record. It is also inconceivable that crying spells now managed to once a month would be vocationally disabling. There is no supporting evidence concerning Plaintiff's claim of memory loss. Thus, there is sufficient evidence (or lack thereof) to uphold ALJ Blair's failure to find these severe impairments, and thus they need not be included in any hypothetical question.

## III.   EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

In her brief, Plaintiff introduces evidence submitted first to the Appeals Council, but does not make an argument for remand based on this "new" evidence. Where a party presents new evidence on appeal to the Appeals Council that denies review or to the federal court for the first time, the Court can consider the evidence only to determine if a remand is appropriate under

sentence six of 42 U.S.C. § 405(g) for further consideration of the evidence but only if the party

seeking remand shows that the new evidence is material.  In this case, Plaintiff has not provided

this Court with an argument for a sentence six remand.  Nor is it evident that this evidence

warrants a remand under sentence six of § 405(g).  The June 2005 opinion of Dr. Dawson that

Plaintiff was not employable was essentially no different than his earlier November 2002,

opinion that was in the record before ALJ Blair.

This Court need only consider issues that have been fully developed by the briefs or in

the record.  Issues that are adverted to in a perfunctory manner without some effort to develop an

argument related to them are generally deemed waived.  *Gragg v. Ky. Cabinet for Workforce

Dev.*, 289 F.3d 958, 963 (6th Cir.2002).  Further, "[i]t is not sufficient for a party to mention a

possible argument in a most skeletal way, leaving the court to . . .  put flesh on its bones."

*McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997).  Therefore, there is no basis for this

court to order a remand based on this evidence first presented to the Appeals Council.

## IV.   RECOMMENDATION

For the reasons stated above, **IT IS RECOMMENDED** that Plaintiff's motion for summary

judgment be **DENIED** and the Commissioner's motion for summary judgement **GRANTED.**  The

parties to this action may object to and seek review of this Report and Recommendation, but are

required to file any objections within ten (10) days of service of a copy hereof as provided for in

28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections

constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140 (1985);

Howard v. Sec'y of Health and Human Servs., 932 F.2d 505 (6th Cir. 1991); United States v.

Walters, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to

raise others with specificity, will not preserve all the objections a party might have to this Report

and Recommendation.  Willis v. Sec'y of Health and Human Servs., 931 F.2d 390, 401 (6th Cir.

1991); Smith v. Detroit Fed'n of Teachers Local, 231, 829 F.2d 1370,1373 (6th Cir. 1987).

Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this

Magistrate Judge.

     Within ten (10) days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than twenty (20) pages in

length unless by motion and order such page limit is extended by the Court.  The response shall

address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 12, 2007             s/Steven D. Pepe

Ann Arbor, Michigan              United States Magistrate Judge

<u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on <u>February 12, 2007</u>, I electronically filed the foregoing paper with
the Clerk  Court using the ECF system which will send electronic notification to the following:
<u>Janet L. Parker, AUSA, Norton J. Cohen, Esq.,</u>  and I hereby certify that I have mailed by United
States Postal Service the paper to the following non-ECF participants: <u>Social Security
Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606</u>

                s/ James P. Peltier
                James P. Peltier
                Courtroom Deputy Clerk
                U.S. District Court
                600 Church St.
                Flint, MI 48502
                810-341-7850
                pete__peliter@mied.uscourts.gov